**FILED**
**United States Court of Appeals**
**Tenth Circuit**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**April 25, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

———————————————————

LARRY A. LAWSON,

    Plaintiff - Appellant,

v.

SPIRIT AEROSYSTEMS, INC.,

    Defendant - Appellee.

No. 23-3136

———————————————————

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:18-CV-01100-EFM)**

———————————————————

Joseph T. Baio, Willkie Farr & Gallagher LLP, New York, New York (James C. Dugan of Willkie Farr & Gallagher LLP, New York, New York and F. James Robinson, Jr. of Hite, Fanning & Honeyman LLP, Wichita, Kansas, with him on the briefs), for Plaintiff-Appellant.

Morgan L. Ratner, Sullivan & Cromwell LLP, Washington, D.C. (Jeffrey B. Wall and Zoe A. Jacoby of Sullivan & Cromwell LLP, Washington, D.C.; Gary L. Ayers and Clayton J. Kaiser of Foulston Siefkin LLP, Wichita, Kansas, with him on the brief), for Defendant-Appellee.

———————————————————

Before **HOLMES**, Chief Judge, **BALDOCK**, and **MATHESON**, Circuit Judges.

———————————————————

**HOLMES**, Chief Judge.

———————————————————

    This contract dispute requires us to predict whether the Kansas Supreme Court would review a non-competition condition precedent to the receipt of future benefits

under the same reasonableness standard as a traditional non-competition covenant. We draw principal guidance from Kansas common law both as it pertains to non-competition covenants, specifically, and as it defines general background principles, which embrace the policy of freedom of contract. We supplement this guidance with an examination of the general weight and trend of non-Kansas authorities. And viewed in totality, this guidance permits us to confidently predict that the answer is "no"— the Kansas Supreme Court would *not* review a non-competition condition precedent to the receipt of future benefits under the same reasonableness standard as a traditional non-competition covenant. Consequently, we (1) affirm the district court's judgment for Defendant-Appellee Spirit Aerosystems, Inc. ("Spirit"); and (2) decline Plaintiff-Appellant Larry Lawson's invitation to certify the question to the Kansas Supreme Court.

After the following summary, our opinion proceeds in four parts. First, we state the facts. Second, we recount this matter's procedural history. Third, we address the legal issues that resolve this case: (1) the scope of Kansas's reasonableness test for non-competition covenants; (2) Mr. Lawson's motion to certify; and (3) the district court's severability analysis. The fourth section concludes.

* * *

After several years as CEO of Spirit, Larry Lawson was ready to retire. But Mr. Lawson had a problem: some of his compensation was tied up in unvested long-term incentive stock awards. Those awards were not immediately monetizable: Spirit

2

was only obliged to deliver the value of Mr. Lawson's shares upon their vestiture, typically years after their initial award. And Mr. Lawson's employment agreement provided that his retirement would cancel the vestiture of several hundred thousand awarded but unvested shares.

To resolve this dilemma, Mr. Lawson struck a bargain with Spirit. The parties memorialized their bargain in a retirement agreement. Under that agreement, Mr. Lawson agreed to stick around as a paid consultant, permitting him to step out of the C-suite while allowing his stock awards to vest as if he remained an active employee.

Like any golden parachute, the extended vesting period came with strings attached: Mr. Lawson's compensation under the retirement agreement, including the extended vesting period, was conditioned on his extended compliance with the non-compete contained in his original employment agreement (the "Covenant" or "Lawson Covenant"). Thus, Mr. Lawson promised not to compete after retiring in exchange for the opportunity to vest in stock awards that otherwise would have terminated upon his retirement.

After entering into the retirement agreement, Mr. Lawson also entered a second consultancy agreement—this one with a hedge fund. The hedge fund—which was waging a proxy campaign to take control of one of Spirit's suppliers, Arconic— touted Mr. Lawson to Arconic's shareholders as a possible replacement CEO. Spirit deemed this arrangement a violation of the non-competition condition incorporated into the Retirement Agreement. Accordingly, Spirit stopped paying Mr. Lawson for

3

his consulting services and terminated the extended vesting period for Mr. Lawson's stock awards.

Mr. Lawson sued Spirit for breach of contract. The district court held a bench trial and found that Mr. Lawson had not violated the Retirement Agreement's non-competition condition. *See Lawson v. Spirit AeroSystems, Inc.* (*Lawson I*), No. 18-1100-EFM, 2021 WL 4870984, at *1, *17 (D. Kan. Oct. 19, 2021). Spirit appealed. We reversed, holding that Spirit was not required to make payments or stock distributions contemplated by the Retirement Agreement because Mr. Lawson had breached the Covenant. *See Lawson v. Spirit AeroSystems, Inc.* (*Lawson II*), 61 F.4th 758, 768 (10th Cir. 2023). But, significantly, we remanded for the district court to determine whether the Covenant was enforceable under Kansas law, which reviews traditional non-competition covenants for reasonableness. *See id.*

On remand, the district court found the Covenant enforceable without reaching the reasonableness test. *See Lawson v. Spirit AeroSystems, Inc.* (*Lawson III*), No. 18-1100-EFM, 2023 WL 4026509, at *14 (D. Kan. June 15, 2023); *see also* Aplt.'s App. at 480 (Dist. Ct. Order in *Lawson III*, dated Jun. 15, 2023). Kansas's reasonableness test, the court concluded, applies only to traditional non-competes or similar restrictive covenants that impose economic penalties for competition ("penalty-for-competition covenants"). Aplt.'s App. at 468–80. In the district court's view, the Covenant was not a traditional noncompete or penalty-for-competition covenant, but instead a non-competition condition precedent to the receipt of future benefits. *Id.* at 472–73. The district court therefore found the

4

Covenant enforceable regardless of its reasonableness and entered judgment for Spirit. *Id.* at 480.

Mr. Lawson now appeals, arguing that the district court should have reviewed the Covenant for reasonableness. He also asks us to certify to the Kansas Supreme Court the question of whether the Covenant is subject to reasonableness review.

For the reasons that follow, we **affirm** the district court's judgment and **deny** Mr. Lawson's motion to certify.

**I**

**A**

Spirit manufactures and sells large commercial aircraft structures. In 2013, Spirit hired Mr. Lawson, an experienced defense industry executive, as its CEO.

When Mr. Lawson accepted the CEO position, he signed an employment agreement ("the Employment Agreement"). The Employment Agreement imposed several restrictions on Mr. Lawson's conduct. Paragraph 4(c) of the Employment Agreement, under the heading "Non-Compete," provides:

> [N]either you nor any individual, corporation, partnership, limited liability company, trust, estate, joint venture, or other organization or association ('Person') with your assistance nor any Person in which you directly or indirectly have any interest of any kind (without limitation) will, anywhere in the world, directly or indirectly own, manage, operate, control, be employed by, serve as an officer or director of, solicit sales for, invest in, participate in, advise, consult with, or be connected with the ownership, management, operation, or control of any business that is engaged, in whole or in part, in the Business, or any business that is competitive with the Business or any portion thereof, except for our exclusive benefit. You will not be deemed to have breached the provisions of this Section 4(c) solely by holding, directly or

5

indirectly, not greater than 2% of the outstanding securities of a company listed on a national securities exchange.

Aplt.'s App. ¶ 10, at 348 (Dist. Ct.'s Findings of Fact & Conclusions of Law in *Lawson I*, dated Oct. 19, 2021).  We refer to this provision as the "Covenant" or "Lawson Covenant."  The Employment Agreement defines "the Business" as "the manufacture, fabrication, maintenance, repair, overhaul, and modification of aerostructures and aircraft components" and notes that Spirit "market[s] and sell[s] [its] products and services to customers throughout the world."  *Id.* ¶ A, at 97 (Employment Agreement, Ex. C to Compl., filed Mar. 28, 2018) (emphasis omitted).  The non-competition restrictions of the Covenant ordinarily (as relevant here) would extend for two years after the termination of employment.  *Id.* ¶ 4(c) (establishing the general provisions for "termination of employment").

"Paragraph 4(f) of the Employment Agreement states that a breach under Paragraph 4 'cannot adequately be compensated by money damages,'" and consequently that "Spirit 'will be entitled, in addition to any other right or remedy available to [them] (including, but not limited, to an action for damages, accounting, or disgorgement of profit), to an injunction restraining such breach or a threatened breach and to specific performance of such provisions.'"  *Id.* at 458 (quoting Aplt.'s App. ¶ 4(f), at 104).

Mr. Lawson's compensation package under the Employment Agreement included a salary, short-term incentive stock awards, long-term incentive stock awards, and bonuses.  Long-term incentive stock awards are a common form of

executive compensation by which an employee is remunerated with the opportunity to acquire discounted shares in their employer. Importantly, Mr. Lawson's long-term incentive stock awards were not immediately monetizable. Instead, they vested a time certain *after* Spirit issued the awards. Only upon vestiture was Spirit obliged to deliver the value of the awarded shares to Mr. Lawson. Thus, the Employment Agreement drew an important distinction between the long-term incentive shares' *award* (at which time they held no value) and those shares' subsequent vestiture (when the shares became monetizable).

Spirit flourished under Mr. Lawson's leadership, and the company's stock value rose. Spirit's increasing stock price redounded to the benefit of both Spirit and Mr. Lawson, substantially boosting the potential value of Mr. Lawson's compensation package.

In late 2015, Spirit communicated to Mr. Lawson its inclination to extend his CEO contract for three years. Mr. Lawson, however, wanted to retire by the end of 2016. Spirit protested but to no avail. After Spirit selected a new CEO, it asked Mr. Lawson to retire early and allow his replacement to take over. Mr. Lawson obliged.

The Employment Agreement provided that following Mr. Lawson's retirement, Mr. Lawson would not be entitled to the complete vestiture of any awarded but unvested long-term incentive shares. Because Mr. Lawson retired effective July 31, 2016, after the "initial term" of the Employment Agreement, Aplt.'s App., ¶ 1(b), at 98 (emphasis omitted), Mr. Lawson was "entitled to retain only those shares awarded under the [long-term incentive plan, or "LTIP"] that [had] otherwise vested

7

in accordance with the terms of the LTIP as of" his retirement, *id.* ¶ 6(iii)(B), at 106. Thus, Mr. Lawson's retirement would have cancelled the vestiture of 408,596 long-term incentive shares. *See* Aplt.'s App., at 352 (Dist. Ct. Mem. & Order, entered Oct. 19, 2021).

## B

In part to avoid the cancellation of Mr. Lawson's outstanding awarded shares, Mr. Lawson and Spirit executed a retirement agreement ("the Retirement Agreement"). *See id.* at 77–86 (Retirement Agreement, Ex. A to Compl., filed Mar. 28, 2018). The Retirement Agreement provided that Mr. Lawson would resign as CEO on July 31, 2016, but that he would provide consulting services to Spirit for two years thereafter. In exchange for Mr. Lawson's consulting services, Spirit agreed to pay consulting fees, severance payments, and a short-term incentive award, and to contribute another $2,000,000 to Mr. Lawson's nonqualified deferred compensation plan. Most importantly, section 2(c) of the Retirement Agreement further provided that Mr. Lawson would "continue to vest (as if he were an active employee) in the awards previously granted to him," *id.* ¶ 2(c), at 78, including the several hundred thousand awarded but then-unvested shares.

But the Retirement Agreement did not entitle Mr. Lawson to enjoy the benefits of "active employee" status without shouldering corresponding burdens. The Retirement Agreement conditioned Mr. Lawson's compensation—along with the *potentiality* of compensation engendered by the extended vesting period—on

Mr. Lawson's compliance with certain restrictions. One such restriction was the reprise of the non-compete contained in Mr. Lawson's 2013 Employment Agreement.

As relevant here, Paragraph 2(g) of the Retirement Agreement provides:

> The Executive [Mr. Lawson] acknowledges that his continuing entitlement to payments and/or vesting under this Paragraph 2 shall be conditioned upon his reaffirmation of this Agreement through the Retirement Date, his cooperation in providing the Transition Services, and his continuing compliance with Paragraphs 4, 6, 7, 10(a) and 15 of the Agreement. The Executive's failure to . . . cooperate in providing the Transition[] Services, or any violation of Paragraphs 4, 6, 7, 10(a) or 15 by the Executive, shall terminate the Company's obligation to continue to make payments and to continue vesting of awards in accordance with this Paragraph 2.

*Id.* ¶ 2(g), at 79. Paragraph 2(g) of the Retirement Agreement thus conditioned the extended vesting period on Mr. Lawson's compliance with (among others) Paragraph 7 of the Retirement Agreement. Paragraph 7 of the Retirement Agreement, in turn, incorporated by reference and extended for two years the non-competition covenant in the 2013 Employment Agreement. In full, Paragraph 7 provides:

> The Executive acknowledges and agrees that he shall continue to be bound by the terms and conditions of Paragraph 4 of the Employment Agreement, the terms of which are incorporated herein by reference; provided, however, that the Executive further acknowledges and agrees that the noncompetition and non-solicitation periods as set forth under Paragraphs 4(c) and (d) of the Employment Agreement shall be extended to the end of the Consulting Term.

*Id.*, ¶ 7, at 81.

Thus, the Retirement Agreement offered Mr. Lawson the opportunity to monetize his already-awarded but as-yet unvested long-term incentive shares, but

conditioned Spirit's obligation to deliver those shares at vesting upon Mr. Lawson's extended compliance with the non-compete in his Employment Agreement.

The conditional structure of the Retirement Agreement could not have been clearer: "*any* violation of [the non-compete Covenant] . . . by [Mr. Lawson] *shall* terminate [Spirit's] obligation . . . to continue vesting of awards . . . ." *Id.* ¶ 2(g), at 79 (emphasis added). Because the unvested, awarded shares had *no value* at the time of Mr. Lawson's retirement, and would have been canceled absent the Retirement Agreement, the Retirement Agreement's extended vesting period created a framework to compensate Mr. Lawson for ongoing post-employment services and conduct—e.g., consulting *and* non-competition—and did *not* reflect delayed disbursement of compensation Mr. Lawson had already earned as Spirit's CEO.[1]

---

[1] To be clear, the Retirement Agreement unequivocally shifted Mr. Lawson's contract with Spirit into the realm of a non-competition condition precedent in which Mr. Lawson had a choice: compete (i.e., breach) and forgo the future monetary benefits of vested shares or refrain from competing (i.e., comply with the Covenant) and receive those benefits. Viewed in isolation, the non-competition features of the Employment Agreement gave Mr. Lawson no such competitive choice. That Agreement clearly provides that Mr. Lawson shall not compete with Spirit for two years following the termination of his employment, and further entitles Spirit to enforce the noncompete with an injunction. *See* Aplt.'s App. ¶¶ 4(c), 4(f), at 103–104; *see also Lawson II*, 61 F.4th at 767.

However, in light of Mr. Lawson's subsequent negotiation of the Retirement Agreement with Spirit, the Employment Agreement's terms cannot be viewed in isolation. In particular, as it relates to Mr. Lawson's competitive choice, the Retirement Agreement explicitly converted the Employment Agreement's non-competition covenant into a condition precedent by noting that Mr. Lawson's "continuing entitlement to payments and/or vesting . . . shall be conditioned upon" certain actions—most notably, abiding by the Covenant, Aplt.'s App. ¶ 2(g), at 79. And, as we later recount, *see* Part II.D, *infra*, the district court ultimately severed the Covenant's injunctive enforcement mechanism, *id.* at 461, leaving no doubt that

## C

Mr. Lawson hoped to serve on the boards of other companies in retirement. To that end, he met with an analyst at a hedge fund, Elliott Management ("Elliott"). Elliott was the largest shareholder in Arconic, a company that, like Spirit, manufactures aerostructure components.

Elliott thought Arconic was underperforming. So Elliott initiated a hostile takeover, aiming to replace Arconic's CEO by nominating additional directors to Arconic's board. Elliott informed Mr. Lawson of its plans and disclosed its interest in proposing him as Arconic's replacement CEO. Mr. Lawson had reservations: Spirit's general counsel indicated that Mr. Lawson's provision of services to Arconic would violate the Retirement Agreement. To assuage Mr. Lawson's concerns, Elliott prepared a Consulting Agreement and an Indemnification Agreement. Under the latter agreement, Elliot promised to indemnify Mr. Lawson for any losses caused by his participation in the Arconic proxy contest, including any action taken by Spirit for his potential breach of the Retirement Agreement.

On the same day that Mr. Lawson signed the Indemnification Agreement, Elliot launched its proxy contest. Elliot's proxy war ended when Arconic's CEO sent an allegedly threatening communication to a principal officer of Elliot, at which point

---

Mr. Lawson could make his competitive choice under the Retirement Agreement free from restraint. Thus, for purposes of this appeal, the upshot is that Paragraph 2(g) of the Retirement Agreement is the clause at issue, *not* the Employment Agreement. And Paragraph 2(g) of the Retirement Agreement is a condition precedent providing Mr. Lawson with a choice: breach and forgo vesting, or comply and vest.

11

the existing Arconic board turned on and ousted the incumbent CEO. Thereafter, Elliot placed three new directors on Arconic's board. Ultimately, however, Mr. Lawson was not selected as a finalist for the Arconic CEO position.

**D**

Two days after Elliot announced its proxy challenge, Spirit notified Mr. Lawson's counsel that Mr. Lawson was in breach of the non-competition Covenant incorporated at Paragraph 7 of the Retirement Agreement. Characterizing Mr. Lawson's participation in the proxy contest as an "egregious violation" of the Covenant, Spirit informed Mr. Lawson that all future payments contemplated by the Retirement Agreement would be cancelled. *See id.* ¶ 49, at 358. Spirit subsequently refused to deliver to Mr. Lawson the value of his outstanding long-term incentive shares on their contemplated vesting dates. In fact, Spirit refused to compensate Mr. Lawson under the Retirement Agreement at all.

Initially, Spirit asserted that Mr. Lawson was obligated to return funds Spirit had previously paid to him under the Retirement Agreement. Spirit also suggested it might seek injunctive relief to enforce the Covenant. Ultimately, though, Spirit never sought damages or injunctive relief. Thus, in the instant case, Mr. Lawson seeks only to recover the money and stock awards that Spirit refused to pay and vest (i.e., future benefits), as opposed to already-earned compensation.

All told, Mr. Lawson's participation in the Arconic proxy contest cost him nearly $31 million, of which almost $29 million was attributable to Spirit's

cancellation of Mr. Lawson's unvested LTIP shares. Elliot covered more than $26 million of Mr. Lawson's losses under the Indemnification Agreement.

## II

The issues before us are drawn into sharp relief by this case's tortuous procedural history, especially Spirit's previous appeal in *Lawson II*.

## A

Invoking diversity jurisdiction under 28 U.S.C. § 1332, Mr. Lawson sued Spirit in the United States District Court for the District of Kansas, seeking relief for breach of contract. The case proceeded to a nine-day bench trial in June 2021. Mr. Lawson maintained that he had not violated the Covenant and that Spirit had thus breached the Retirement Agreement by refusing to compensate him. Spirit contended that Mr. Lawson had violated the Covenant, so he was not entitled to cash payments or stock vestiture under the Retirement Agreement.

Particularly relevant here, Mr. Lawson also proposed an alternative theory of the case: Even if the district court found him in breach, he argued, the court should void the Covenant as "unreasonable" under *Weber v. Tillman*, 913 P.2d 84 (Kan. 1996), which articulated a four-factor test governing the enforceability of non-competes in Kansas employment contracts. Spirit responded that the Covenant was not subject to *Weber* review—which it asserted applies only to traditional non-competes—and that even if *Weber* did apply the Covenant was reasonable.

13

**B**

In Autumn 2021, the district court issued findings of fact and conclusions of law and entered judgment for Mr. Lawson. *See Lawson I*, 2021 WL 4870984. The court found that Mr. Lawson's arrangement with Elliott did not violate the Covenant because (1) Elliott was not engaged in the same business as Spirit; (2) Mr. Lawson and Elliott did not control Arconic but were in fact adverse to Arconic in the proxy contest; and (3) Elliott did not use Mr. Lawson's assistance to invest in Arconic. Thus, as the district court concluded, "Spirit breached the Retirement Agreement by failing to pay Plaintiff [Mr. Lawson] the sums due under the Agreement." *See id.* ¶ 24, at 383.

The district court explicitly found that Mr. Lawson's long-term incentive award shares were not immediately monetizable and that Spirit was only obligated to deliver the awarded shares on their vesting date. The district court further found that, at the time of his resignation, Mr. Lawson had an interest in over 400,000 unvested awarded shares, all of which would have been canceled absent the Retirement Agreement's extended vesting period.

Because the district court concluded that Mr. Lawson had not violated the Covenant, it did not reach the question of reasonableness under *Weber*.

**C**

Spirit appealed, assigning error to the district court's conclusion that Mr. Lawson had not violated the Covenant. *See* Aplt.'s Opening Br., No. 21-3213, at *20–22 (10th Cir., filed Mar. 3, 2022). Spirit also maintained that the Covenant was

14

not a traditional non-compete subject to *Weber* review and, in any event, that it satisfied *Weber's* four-factor test. *See id.* at *46–56. Mr. Lawson responded that Spirit's interpretation of the Covenant flunked at least three out of four prongs of *Weber* review. *See* Aplee.'s Resp. Br., No. 21-3213, at *42–44 (10th Cir., filed May 5, 2022).

We reversed the district court's judgment and remanded the case. *See Lawson II*, 61 F.4th at 759–60. We held that the Retirement Agreement conditioned Mr. Lawson's receipt of future benefits on his continued compliance with the Covenant and that Mr. Lawson had indeed breached the Covenant because (1) Mr. Lawson had an interest in Elliott; (2) Elliott invested in Arconic; and (3) Arconic was engaged in the manufacture of aircraft components and that activity fell within the Employment Agreement's definition of "Business." *See id.* at 759–66. Consequently, Mr. Lawson's arrangement with Elliott "triggered a forfeiture of Mr. Lawson's right to future benefits." *Id.* at 766.

Without ruling on the Covenant's enforceability, we observed that the Retirement Agreement "unambiguously made Mr. Lawson's compliance with the covenant a *condition* to his future payments and vesting of stock awards." *Id.* at 767 (emphasis added). Nonetheless, we noted, the Covenant "also *subjected Mr. Lawson to remedies* [by Spirit] such as damages, accounting, disgorgement of profits, and an injunction" and "*prohibits* Mr. Lawson from working for competitors even though Spirit doesn't seek to enforce these prohibitions." *Id.* (emphasis added). We thus concluded that the Covenant could be enforced in two ways: as a traditional

15

non-competition covenant or penalty-for-competition clause or, alternatively, as a non-competition condition precedent to receipt of future benefits. *Id.* We counseled that "a court would need to consider how to approach the issue of enforceability" in light of the Covenant's dual enforcement mechanisms. *Id.* We further suggested that "if the covenant serves only as a condition to future payments, rather than as a restraint against competition, there may be no public policy to inhibit enforcement" and, in fact, "public policy could support the enforceability of contracts in which employers compensate highly paid executives to avoid working for competitors." *Id.* at 767–68.

Finally, we noted that Spirit had not attempted to enforce the Covenant as a traditional non-compete or penalty-for competition covenant, but only as a condition precedent to receipt of future benefits. *See id.* at 768. To account for this distinction, we noted, "a court must determine whether the covenant's dual [enforcement mechanisms] are severable." *Id.* The parties failed to brief the severability issue in *Lawson II* and, given that the severability question "entail[ed] a fact-intensive inquiry" and "could directly affect the enforceability of the covenant," we "reverse[d] and remand[ed] for further proceedings to determine the enforceability of the covenant." *Id.* We did not disturb the district court's characterization of Mr. Lawson's outstanding stock awards as unvested and thus not immediately monetizable, *see id.* at 759, nor did we quibble with the district court's characterization of the Covenant as a condition precedent to the receipt of future benefits, *see id.* at 760, 767–68.

16

**D**

On remand, the district court ruled in favor of Spirit. *See* Aplt.'s App.

at 456–80 (Dist. Ct. Mem. & Order, entered Jun. 15, 2023); *see also Lawson III*,

2023 WL 4026509. The court's analysis proceeded in two steps.

*First*, based on our suggestion that "[i]f severable, and 'the covenant serves

only as a condition to future payments, rather than as a restraint against competition,

there may be no public policy to inhibit enforcement,'" the court considered whether

the Covenant's enforcement mechanisms were severable. Aplt.'s App. at 457–58

(quoting *Lawson II*, 61 F.4th at 767). The district court concluded that "[t]he

condition precedent is easily severable from the remainder of the covenant's

enforcement mechanisms." *Id.* at 461 (bold typeface omitted). In support, the

district court noted that (1) the injunctive and damages mechanisms, on the one hand,

and the condition precedent mechanism, on the other, "are quite distinct, offering

both a carrot and stick disincentivizing Plaintiff from working with actual or

potential competitors"; (2) the relevant agreements contain broad severability

clauses; and (3) Spirit had disavowed any intention of enforcing the Covenant by

seeking an injunction or damages. *See id.* at 463–66.

*Second*, the district court considered "whether the application of the condition

precedent was consistent with Kansas law." *Id.* at 467. The district court began by

outlining Kansas's case law on the enforceability of non-competition covenants,

concluding that "Kansas courts have recognized the validity of predicating an award

of *future benefits* upon compliance with a contract['s] conditions." *Id.* at 469 & n.30

17

(emphasis added) (first citing *Sweet v. Stormont Vail Reg'l Med. Ctr.*, 647 P.2d 1274, 1280 (Kan. 1982); and then citing *Mirrow v. Barreto*, 80 F. App'x 616, 618 (10th Cir. 2003)). Consequently, the district court predicted that the Kansas Supreme Court would *not* extend *Weber* reasonableness review to the Covenant's enforcement because it was a non-competition condition precedent to the receipt of future benefits.

Mr. Lawson resisted, referring the court to *Varney Bus. Servs., Inc. v. Pottroff*, wherein the Kansas Supreme Court applied the *Weber* test to a non-traditional non-compete provision. Aplt.'s App. at 469 (quoting *Varney*, 50 P.3d 1003, 1015 (Kan. 2002)). But the district court declined Mr. Lawson's invitation to apply the rule in *Varney*. *Id.* According to the district court, the operative question was not whether the Covenant constitutes a "traditional" non-compete, but the character of the Covenant's incentive structure. The covenant in *Varney*, though "non-traditional"—insofar as it required the promisor to pay a percentage of new earnings to the promisor's former employer—is identical to a "traditional" non-compete or penalty-for-competition clause insofar as it leverages *negative* economic consequences to discourage competition. *Id.* at 469–70. As the district court put it:

> Neither *Varney*, nor any of the cases cited in that decision, involved a condition precedent, where the relevant provision does not directly prohibit the reemployment or force the employee to essentially lose all the benefits of his new employment. *Varney* simply provides no support for Plaintiff's argument that all economic disincentives from alternative employment are subject to *Weber's* reasonableness requirement.

*Id.* at 470.

The district court also rejected Mr. Lawson's analogy to *Ainslie v. Cantor Fitzgerald L.P.*, C.A. No. 9436-VCZ, 2023 WL 106924, at *2 (Del. Ch. Jan. 4, 2023) (unpublished). In *Ainslie*, the Delaware Court of Chancery extended reasonableness review to a covenant conditioning distributions of *already-earned* partnership income on compliance with a non-compete. *Id.* The district court deemed the Chancery Court's non-binding decision unpersuasive, distinguishing both its reasoning and its "radically different factual circumstances." Aplt.'s App. at 473.

Finally, the district court noted that the underlying facts of this case are starkly distinguishable from the circumstances to which Kansas courts have extended *Weber*. *See id.* at 474–79. The Lawson Covenant never threatened to prevent anyone from making a living: Mr. Lawson was a highly-compensated, well-counseled executive who exchanged a promise not to compete for an extended stock option vesting period. *See id.* Thus, the district court concluded:

> A court may appropriately uphold conditional benefit provisions as applied to "well[-]compensated, high-level professionals who were given *the option* to join the program during their employment and, following separation, had the *further choice* of whether to receive payments *or* to compete with [their former employer]." Plaintiff has presented no persuasive authority for a contrary result. The Court finds the present case offers no grounds for departure from the "paramount public policy" of Kansas—freedom of contract.

*Id.* at 479–80 (footnote omitted) (alteration in original) (quoting *Allegis Grp., Inc. v. Jordan*, 951 F.3d 203, 211 (4th Cir. 2020) (applying Maryland law)). Thus, the district court found the Covenant enforceable regardless of reasonableness. *See id.* at 480.

19

The court entered judgment for Spirit, and Mr. Lawson timely appealed.

**F**

Mr. Lawson also urges us to certify the following question to the Kansas

Supreme Court:

> Under Kansas law, must courts apply the four-part
> reasonableness test established by the Kansas Supreme Court in
> *Weber v. Tillman*, in determining whether to enforce a
> non-compete clause when a former employee's compliance with
> the clause serves as a condition precedent to the receipt of the
> employee's *previously earned* compensation and the failure of the
> condition triggers the forfeiture of such compensation?

Aplt.'s Mot. to Certify, No. 23-3136 at *1 (10th Cir., filed Oct. 20, 2023) (emphasis

added) (citation omitted).  Spirit opposes certification.

**III**

We have jurisdiction to decide this appeal under 28 U.S.C. § 1291.  Our

analysis proceeds in two parts.  First, we articulate the relevant standards of review

and applicable law.  Second, we address the three substantive issues that resolve this

case.

**A**

In an appeal from a bench trial like this one, we review the district court's

findings of fact for clear error and its legal conclusions de novo.  *See Harmon v. Cty.*

*of Norman, Okla.*, 61 F.4th 779, 787 (10th Cir. 2023).  We apply Kansas law in this

diversity action and "review de novo the district court's interpretation of state law."

*Evanston Ins. Co. v. Desert State Life Mgmt.*, 56 F.4th 899, 905 (10th Cir. 2022).

Our "task is not to reach [our] own judgment regarding the substance of the common

law, but simply to 'ascertain and apply the state law'" as it exists. *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

To resolve this case, we must rule on an issue of Kansas law that the Kansas Supreme Court is yet to decide. Where, as here, "no controlling state decision exists," we must "attempt to predict what the state's highest court would do." *See Wade*, 483 F.3d at 666 (quoting *Wankier*, 353 F.3d at 866). In other words, we must render an *Erie* prediction.[2] Our prediction is guided by an overarching reticence to expand state law absent "clear guidance from [the state's] highest court." *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013) (quoting *Taylor v. Phelan*, 9 F.3d 882, 887 (10th Cir. 1993)).

**B**

We begin by surveying the relevant authorities. We ultimately predict that the Kansas Supreme Court would decline to subject the Lawson Covenant to *Weber* review. Relatedly, we deny Mr. Lawson's eleventh-hour motion to certify. Finally, we reject Mr. Lawson's challenge to the district court's severability analysis.

---

[2] We have sporadically used the term "*Erie* guess" to describe such a prediction. *See, e.g.*, *Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901 (10th Cir. 2005); *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1207 (10th Cir. 2022) (quoting *Pehle*, 397 F.3d at 901); *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 852 (10th Cir. 2015) (same); *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1295 (10th Cir. 2017) (quoting *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 611 (5th Cir. 2016)); *Chieftain Royalty Co. v. SM Energy Co.*, 100 F.4th 1147, 1152 n.6 (10th Cir. 2024).

**1**

The key question presented by this appeal is whether, under Kansas law, a non-competition condition precedent to the receipt of future benefits is subject to the same reasonableness review as a traditional non-competition provision. Despite a dearth of on-point authority, we have little difficulty concluding, as the district court did, that the Kansas Supreme Court would not extend *Weber* reasonableness review to the Covenant before us.

Our cases identify three categories of authority that are especially relevant to our *Erie* prediction: (1) relevant decisions of the state's appellate courts; (2) background legal principles undergirding related or analogous state jurisprudence; and (3) "'the general weight and trend of authority' in the relevant area of law." *Wade*, 483 F.3d at 666 (quoting *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir. 2006)); *see MidAmerica*, 436 F.3d at 1262 (highlighting the importance to the diversity analysis of "analogous decisions by the state Supreme Court" (quoting *Progressive Cas. Ins. Co. v. Engemann*, 268 F.3d 985, 988 (10th Cir. 2001))). The following subsections examine data points drawn from each of these broad categories of authority—using them to help us predict whether the Kansas Supreme Court would be inclined to extend *Weber* reasonableness review to the Covenant before us. All three sources of authority suggest that the Kansas Supreme Court would enforce the Covenant *without* reasonableness review.

22

**a**

Mr. Lawson argues that Kansas law subjects *all* non-competes to *Weber* reasonableness review.  Thus, as Mr. Lawson maintains, the covenant before us is subject to reasonableness review regardless of "the function of the clause or the remedies available to enforce it."  Aplt.'s Opening Br. at 3.  Mr. Lawson supports his argument with *Weber* itself, *Varney*, and *Idbeis v. Wichita Surgical Specialists*, 112 P.3d 81 (Kan. 2005).

For *Weber* to control this case, in our view, the Kansas Supreme Court would have to apply its holding at an unreasonable level of generality.  The *Weber* Court held that non-competition covenants that were enforceable by liquidated damages, i.e., penalty-for-competition covenants, are valid and enforceable only if "reasonable under the circumstances and not adverse to the public welfare."   But this case does not involve a penalty-for-competition covenant, and thus falls outside *Weber*'s ambit.

Whereas the covenant in *Weber restrained* competition by subjecting the party in breach to *a penalty*, the Covenant before us does no such thing.  It merely provides a *monetary incentive* in the form of future benefits for not competing: the worker has a choice between competing and thereby forgoing the future benefits or not competing and receiving those benefits.  Viewed another way, it merely *discourages* competition by conditioning the receipt of future benefits on compliance.  This is a distinction with a substantial difference: a penalty-for-competition covenant affirmatively *punishes* a former employee for competing, whereas the covenant before us gives the employee a *choice* between competing or enjoying future

23

benefits. We predict that the Kansas Supreme Court would give legal meaning to this difference in its analysis and that it, consequently, would not view *Weber*'s holding as being the proper analytical fit—even by analogy—for the Lawson Covenant.

Mr. Lawson's best argument relies on the Kansas Supreme Court's decision in *Varney*. The *Varney* Court extended reasonableness review to a non-traditional penalty-for-competition covenant requiring former employees to pay to their former employer a percentage of the fees they earned by providing services to clients of the former employer. 59 P.3d at 1015–17. The Kansas Supreme Court reasoned that because penalty-for-competition provisions "serve the same purpose as covenants not to compete," "a distinction between the two types of provisions is artificial and meaningless." *Id*. at 1016. So too here, says Mr. Lawson: "[t]he practical and economic reality of the [non-competition condition precedent to the receipt of future benefits] is that it restrained competition in the same manner as any other non-compete clause." Aplt.'s Opening Br. at 24.

But *Varney* did not hold that *all* non-traditional non-competes, however configured, are subject to *Weber* reasonableness scrutiny. Instead, we read *Varney* to hold that provisions *enforceable* in the same or similar manner as traditional non-competition covenants—through some form of monetary penalty—are subject to reasonableness review. The *Varney* Court thus extended the rule in *Weber*, but only to non-traditional penalty-for-competition covenants, and not (as Mr. Lawson urges) to all "non-traditional" non-competes. And because the Lawson Covenant is not a

24

penalty-for-competition covenant, we predict the Kansas Supreme Court would conclude that this case falls outside *Varney's* bailiwick.

Finally, Mr. Lawson argues that the Kansas Supreme Court's decision in *Idbeis* mandates that the Covenant is subject to reasonableness review. Specifically, Mr. Lawson relies on the *Idbeis* court's dictum that "[i]t is the scope of the restriction, not the presence of a remedy, which makes the covenant enforceable." 112 P.3d at 92. But Mr. Lawson takes this non-binding dictum out of context. The *Idbeis* court's relevant discussion concerned *how*—not *whether*—the *Weber* test ought to apply. Because *Idbeis* concerned a traditional penalty-for-competition clause, the Kansas Supreme Court applied the *Weber* test without further analysis as to whether it was applicable. 112 P.3d at 86–87. The *Idbeis* court had no need to grapple with the threshold question before us, i.e., whether the *Weber* test applies at all. Therefore, we predict that the Kansas Supreme Court would not find its *Idbeis* decision relevant to the issue at hand.

Spirit, for its part, maintains that the Kansas Supreme Court's decision in *Miller v. Foulston, Siefkin, Powers, & Eberhardt*, 790 P.2d 404 (Kan. 1990), definitively resolves this case in its favor. *Miller* concerned a forfeiture-for-competition provision—specifically, a non-competition condition precedent to the distribution of *already-earned* benefits—in an attorney's retirement agreement. *See id.* at 408–09. The *Miller* court deemed the covenant enforceable *without* subjecting it to reasonableness review. *Id.* at 413. For reasons that we explicate further below, it cannot be gainsaid that *Miller* militates in Spirit's favor. Like this case, *Miller*

25

involves a non-competition condition precedent—making it the most factually analogous case that the parties have adduced—and the court concluded that reasonableness review was not required. However, *Miller* is not free from material distinctions from this case. Most significantly, the Kansas Supreme Court assessed the covenant under an *unrelated* legal standard—the Kansas Code of Professional Responsibility for attorneys. *See id.* at 407–09, 411. Thus, in our view, the Kansas Supreme Court would be unlikely to conclude that *Miller* is controlling regarding the applicability of reasonableness review to the Lawson Covenant—though the Court would likely conclude *Miller* persuasively suggests that such review does *not* apply.

In sum, in surveying the relevant Kansas Supreme Court cases, none speaks definitively to the propriety of applying *Weber* reasonableness review to payment-conditioning covenants like the one here. However, they offer several clues as to how the Kansas Supreme Court would address that issue.

First, the *Miller* court's belief that a provision that allowed for the loss of *already-earned* benefits did not require reasonableness review because it was materially distinct from a penalty-for-competition covenant strongly suggests that the Kansas Supreme Court would be similarly inclined to not require reasonableness review where the loss to the would-be competitor is even *less* severe insofar as it involves no vested (i.e., already earned) interests—as is true with a non-competition condition precedent to the receipt of *future* benefits at issue here. More specifically, the Kansas Supreme Court's reasoning in *Miller* recognized the material difference between the incentive structures generated by a penalty-for-competition covenant and

26

a non-competition condition precedent; in the latter, the would-be competitor is given a choice to claim a benefit or forgo it and is not penalized for competition per se. *See* 790 P.2d at 413 ("Plaintiff had to choose between retiring, including stopping the practice of law and receiving over $190,000 in retirement benefits, or continuing the practice of law, in which case he lost retirement benefits."). The *Miller* court's recognition of the distinction between penalty-for-competition covenants and non-competition conditions precedent—and its refusal to subject the latter to the same reasonableness review that the Kansas Supreme Court applies to the former—supports a prediction that the Kansas Supreme Court would not extend *Weber* review to the covenant before us.

Second, *Weber's* policy justifications apply with less force, if at all, to the Lawson Covenant. Reasonableness review addresses the risk that (1) disparate bargaining power between employers and employees will lead to one-sided non-competes that leave former employees unable to support themselves upon termination, and (2) overbroad non-competition covenants will decrease options available to consumers and generate market inefficiencies. *See Lawson II*, 61 F.4th at 767; *H & R Block, Inc. v. Lovelace*, 493 P.2d 205, 211 (Kan. 1972).

Neither policy rationale for *Weber* review applies here. Mr. Lawson is a sophisticated business executive who, aided by counsel, negotiated the terms of a non-competition condition precedent in exchange for, *inter alia*, an extended vesting period for stock awards that would otherwise have terminated upon his retirement. Indeed, the district court reasonably concluded that Mr. Lawson's bargaining power

was equal to that of his employer—a finding that Mr. Lawson does not challenge on appeal. And there was never any danger that the Covenant would prevent Mr. Lawson from making a living: indeed, if Mr. Lawson had *complied* with the Covenant, he would have been compensated for his consulting services for Spirit and been amply compensated in a mere two years by the vestiture of his outstanding shares award. Likewise, given the specialized nature of the aircraft manufacturing sector and the global market for its products, it is not surprising that Mr. Lawson has not demonstrated that his compliance with the Covenant would have posed a serious risk of negatively impacting consumer product options or generating market inefficiencies. *Cf. Graham v. Cirocco*, 69 P.3d 194, 198 (Kan. Ct. App. 2003) (expressing concern that a non-competition covenant could impact the community by restricting access to doctors).

As the foregoing citation to *Graham* suggests, our predictive analysis is not restricted to the decisions of the Kansas Supreme Court. *See Wade*, 483 F.3d at 666. But *Graham* appears to be the sole case from the lower Kansas appellate courts that sheds meaningful light on the question before us. To be sure, Mr. Lawson directs us to two decisions from the Kansas Court of Appeals: *Wichita Clinic, P.A. v. Louis*, 185 P.3d 946 (Kan. Ct. App. 2008) and *Murati v. Gilbert*, No. 80,685, 2000 WL 36745652 (Kan. Ct. App. Jan. 7, 2000) (per curiam) (unpublished). *Wichita Clinic* involved a penalty-for-competition clause like the one in *Varney*, *see Wichita Clinic*, 185 P.2d at 952, and *Murati* concerned a "traditional" non-compete, *Murati*, 2000 WL 36745652, at *1. Consequently, neither of these cases advances the analytical

ball, much less alters the predictive judgment that we have formed from reviewing the decisions of the Kansas Supreme Court. And that judgment—especially shaped by *Miller*—is that the Kansas Supreme Court would decline to subject the Lawson Covenant to reasonableness review.

**b**

Background principles of Kansas contract law likewise strongly suggest that the Kansas Supreme Court would not review the Covenant for reasonableness. Freedom of contract is the fountainhead of Kansas contract law. *Foltz v. Struxness*, 215 P.2d 133, 139 (Kan. 1950) ("[T]he *paramount* public policy is that freedom to contract is not to be interfered with lightly." (emphasis added)); *see also Varney*, 59 P.3d at 1015; *Wichita Clinic*, 185 P.3d at 951; *Doan Family Corp. v. Arnberger*, 522 P.3d 364, 369–70 (Kan. Ct. App. 2022). Kansas's emphasis on freedom of contract dictates that non-competition covenants, like all other contracts, "should be presumed legal, and the party challenging the contract has the burden to prove it is illegal." *Wichita Clinic*, 185 P.3d at 951; *see also Varney*, 59 P.3d at 1014–15.

In our view, Kansas's very high regard for freedom of contract militates against expanding *Weber*—which, in effect, is one of Kansas's limited exceptions to its default practice of enforcing bargained-for non-competition covenants. Kansas courts have carved out only limited exceptions to the presumptive enforceability of covenants not to compete. *See, e.g.*, *Waste Connections of Kan. v. Ritchie*, 298 P.3d 250, 265 (Kan. 2013) (highlighting an exception for contracts that are illegal or contrary to public policy); *Safelite Glass Corp. v. Fuller*, 807 P.2d 677, 681 (Kan. Ct.

29

App. 1991) (recognizing an exception for certain non-competition clauses related to sale of a business); *H & R Block, Inc.*, 493 P.2d at 210–11 (same). And the *Weber* reasonableness test is one such narrow exception. Indulging Mr. Lawson's request to scrutinize non-competition conditions precedent to the receipt of future benefits for reasonableness would have the effect of expanding that limited exception. Kansas's favorable sentiment toward freedom of contract would give us pause under any circumstances in doing that. Moreover, we are especially reticent to effectuate such an expansion proceeding in diversity, as we do, where no Kansas court has ever subjected a non-competition condition precedent to future benefits to reasonableness review.

In sum, we conclude that background principles of Kansas contract law also strongly suggest that the Kansas Supreme Court would not review the Covenant for reasonableness.

**c**

The general weight and trend of authority support our prediction that the Kansas Supreme Court would not review the Lawson Covenant for reasonableness. The decisions of states' highest courts—that is, their apex courts—reveal two perspectives regarding the applicability of reasonableness review to non-competition conditions precedent: specifically, views embodied in (1) the employee choice doctrine and (2) the pragmatic approach.[3] Under the employee choice doctrine, the

---

[3]      We do not suggest that decisions issued by non-apex courts are irrelevant to the analysis: the Kansas Supreme Court could possibly examine them,

Lawson Covenant would not be subject to reasonableness review.  The pragmatic

approach, by contrast, *would* subject the Lawson Covenant to reasonableness review.

Importantly, the Kansas Supreme Court has not yet expressly embraced either

the employee choice doctrine or the pragmatic approach.  However, for reasons

discussed below, we predict that the Kansas Supreme Court would reach a conclusion

regarding the applicability of reasonableness review to non-competition conditions

precedent to future benefits, like the Lawson Covenant, that is similar to the

conclusion that would be reached by those courts that have embraced the employee

choice doctrine; that is, the Kansas Supreme Court would determine that

reasonableness review is *not* applicable.  Moreover, the trend of authority plainly

favors the employee choice doctrine, which would eschew reasonableness review.

Accordingly, the following survey of the weight and trend of out-of-state authority

---

too, in the absence of decisions from a state's apex court.  Indeed, state intermediate
courts and federal courts sitting in diversity have handed down significant decisions
that have shaped the development of both the employee choice doctrine and the
pragmatic approach.  *See, e.g.*, *Van Pelt v. Berefco, Inc.*, 208 N.E.2d 858, 865
(Ill. App. 1965); *Brown Stove Works, Inc. v. Kimsey*, 167 S.E.2d 693, 695 (Ga. App.
1969); *Neuffer v. Bakery & Confectionery Workers Int'l Union of Am.*, 307 F.2d 671,
673 (D.C. Cir. 1962); *Rochester Corp. v. Rochester*, 450 F.2d 118, 122–23 (4th Cir.
1971); *Golden v. Kentile Floors, Inc.*, 512 F.2d 838, 844 (5th Cir. 1975).

Nonetheless, we limit our quantitative analysis of the weight and trend of
authority to state apex court decisions in the interest of analytical clarity.  State apex
courts are the only courts with authority to speak definitively on a jurisdiction's
adoption of one or another doctrinal approach on the question before us.  Decisions
from non-forum state intermediate appellate courts and federal courts sitting in
diversity, while not necessarily lacking in probative value concerning the nature of
the forum state's jurisprudence, are of course—as a structural matter—incapable of
definitively defining state law in their jurisdictions.

buttresses our prediction that the Kansas Supreme Court would decline to analyze the Lawson Covenant for reasonableness.

Most states, like Kansas, apply some form of reasonableness review to non-competition covenants ancillary to employment contracts. *See Lawson II*, 61 F.4th at 767. Courts are divided, however, as to whether reasonableness review should extend to non-competition conditions precedent. *See Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 690 nn.102, 104 (Del. 2024). The first courts to consider the issue articulated what is now known as the employee choice approach. *See Kristt v. Whelan*, 4 A.D.2d 195, 199 (N.Y. App. Div. 1957), *aff'd*, 155 N.E.2d 116 (N.Y. 1958); *Ekman v. United Film Serv., Inc.*, 335 P.2d 813, 814–15 (Wash. 1959). Under the employee choice approach, non-competition covenants are *not* subject to reasonableness review "where an employer conditions receipt of postemployment benefits upon compliance." *Morris v. Schroder Cap. Mgmt. Int'l*, 859 N.E.2d 503, 506 (N.Y. 2006); *see also Cantor Fitzgerald*, 312 A.3d at 684 (explaining that under the employee choice approach, "courts do not review forfeiture-for-competition provisions for reasonableness"); *Cheney v. Automatic Sprinkler Corp. of Am.*, 385 N.E.2d 961, 964 (Mass. 1979) (similar); *LKQ Corp. v. Rutledge*, 2024 WL 5152746, at *1 (Del. Dec. 18, 2024) (similar). Because the Lawson Covenant before us plainly "conditions receipt of postemployment benefits upon compliance[,]" it would escape reasonableness review under the employee choice approach. *See Morris*, 859 N.E.2d at 506.

In the mid-1960s another doctrinal perspective emerged, which we call the "pragmatic" approach. *See Neuffer v. Bakery & Confectionery Workers Int'l Union of Am.*, 307 F.2d 671, 673 (D.C. Cir. 1962); *see also Union Cent. Life Ins. Co. v. Balistrieri*, 120 N.W.2d 126, 128–29 (Wis. 1963); *Muggill v. Reuben H. Donnelley Corp.*, 398 P.2d 147, 149 (Cal. 1965). Courts adopting the pragmatic approach reject employee choice on the rationale that non-competition conditions precedent are *functionally* indistinguishable from traditional covenants not to compete—and, thus, review non-competition conditions precedent for reasonableness. *See Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 130 (Neb. 2014); *Deming v. Nationwide Mut. Ins. Co.*, 905 A.2d 623, 638 (Conn. 2006). From the pragmatic perspective, although non-competition conditions precedent leverage a different incentive structure from traditional non-competition covenants—the former the carrot, the latter the stick—they remain alternate means to an identical end. *See Deming*, 905 A.2d at 638 (quoting *Almers v. S.C. Nat'l Bank of Charleston*, 217 S.E.2d 135, 140 (S.C. 1975)). The Restatement (Second) of Contracts adopts the pragmatic approach. § 185 (Am. L. Inst. 1981), Westlaw (database updated Oct. 2024). Under the pragmatic approach, the Lawson Covenant would be subject to reasonableness review.

Courts across the country have referred to employee choice as the "majority" view for a half-century. *See, e.g.*, *LKQ Corp. v. Rutledge*, 96 F.4th 977, 984 (7th Cir. 2024); *Deming*, 905 A.2d at 634; *Schlumberger Tech. Corp. v. Blaker*, 859 F.2d 512, 517 (7th Cir. 1988); *Grebing v. First Nat. Bank of Cape Girardeau*, 613 S.W.2d 872,

33

874–75 (Mo. Ct. App. 1981); *Cheney*, 385 N.E.2d at 964; *Rochester Corp. v. Rochester*, 450 F.2d 118, 122–23 (4th Cir. 1971); *Almers*, 217 S.E.2d at 138.

However, since at least the mid-1990s—when taking into account only apex state courts—it appears that this description has been inaccurate.

By our count, state apex courts have adopted the pragmatic approach by a slim, one-jurisdiction majority. Of the twenty-six jurisdictions whose apex courts have considered the enforceability of non-traditional non-competes, nine have adopted employee choice.[4] Although seventeen jurisdictions apply some form of reasonableness review,[5] seven of those jurisdictions do so *not* based on state common

---

[4]     *Kristt*, 155 N.E.2d 116 (N.Y. 1958); *Nationwide Mut. Ins. Co. v. Tatem*, 173 S.E.2d 818, 820 (Va. 1970); *Alldredge v. City Nat. Bank & Tr. Co. of Kansas City*, 468 S.W.2d 1, 4 (Mo. 1971); *Swift v. Shop Rite Food Stores, Inc.*, 489 P.2d 881, 883 (N.M. 1971); *Garner v. Girard Trust Bank*, 275 A.2d 359, 361–62 (Pa. 1971); *Woodward v. Cadillac Overall Supply Co.*, 240 N.W.2d 710, 711 (Mich. 1976); *Courington v. Birmingham Tr. Nat. Bank*, 347 So. 2d 377, 383 (Ala. 1977); *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 456 P.3d 201, 212 (Idaho 2019); *Cantor Fitzgerald*, 312 A.3d at 691.

[5]     *Union Cent. Life Ins. Co.*, 120 N.W.2d at 128–29; *Muggill*, 398 P.2d at 149; *Flammer v. Patton*, 245 So. 2d 854, 859–60 (Fla. 1971); *Van Hosen v. Bankers Tr. Co.*, 200 N.W.2d 504, 508 (Iowa 1972); *Food Fair Stores, Inc. v. Greeley*, 285 A.2d 632, 638 (Md. 1972); *Lavey v. Edwards*, 505 P.2d 342, 346 (Or.1973); *Graham v. Hudgins, Thompson, Ball & Assocs., Inc.*, 540 P.2d 1161, 1163 (Okla. 1975); *Almers*, 217 S.E.2d at 138–39; *Sheppard v. Blackstock Lumber Co.*, 540 P.2d 1373, 1375–76 (Wash. 1975); *Harris v. Bolin*, 247 N.W.2d 600, 602–03 (Minn. 1976); *Cheney*, 385 N.E.2d at 965; *A.L. Williams & Assocs. v. Faircloth*, 386 S.E.2d 151, 153 (Ga. 1989); *Brockley v. Lozier Corp.*, 488 N.W.2d 556, 562–63 (Neb. 1992); *Werlinger v. Mut. Serv. Cas. Ins. Co.*, 496 N.W.2d 26, 29–30 (N.D. 1993); *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723, 731 (Ariz. 2006); *Deming*, 905 A.2d at 632–33; *Mungas v. Great Falls Clinic, LLP*, 221 P.3d 1230, 1237–38 (Mont. 2009).

law, but *instead* based on public policy enshrined in positive legislation.[6]  Following

the example of numerous other courts,[7] we exclude these seven states from our

comparative analysis.

We are left with nine employee choice jurisdictions and ten jurisdictions

applying the pragmatic approach.[8]  And, as noted, the Kansas Supreme Court has not

---

[6]    *Union Cent. Life Ins. Co.*, 120 N.W.2d at 128–29 (citing Wis. Stat. Ann. § 103.465); *Muggill*, 398 P.2d at 149 (citing Cal. Bus. & Prof. Code § 16600); *Flammer*, 245 So. 2d at 859–60 (citing Fla. Stat. Ann. § 542.12); *Graham*, 540 P.2d at 1163 (citing Okla. Stat. Ann. tit. 15, § 217); *Sheppard*, 540 P.2d at 1375–76 (citing Wash. Rev. Code Ann. § 19.86.030); *Werlinger*, 496 N.W.2d at 29–30 (citing N.D. Cent. Code Ann. § 9-08-06); *Mungas*, 221 P.3d at 1237–38 (citing Mont. Code Ann. § 28-2-703).

[7]    *See Alldredge*, 468 S.W.2d at 4; *Cheney*, 385 N.E.2d at 964; *Collister v. Bd. of Trustees of McGee Co. Profit Sharing Plan*, 531 P.2d 989, 991 (Colo. App. 1975).

[8]    If we expand the analysis to include jurisdictions where the apex court has not adopted either doctrinal perspective, and credit relevant decisions of state intermediate appellate courts and non-forum federal courts sitting in diversity, then employee choice has a one-jurisdiction majority.  *Compare Alco-Columbia Paper Serv., Inc. v. Nash*, 273 So. 2d 630, 634 (La. Ct. App. 1973) (embracing employee choice), *Hudson v. N. Carolina Farm Bureau Mut. Ins. Co.*, 209 S.E.2d 416, 418 (N.C. App. 1974) (same), *Collister*, 531 P.2d at 991 (same), *Dollgener v. Robertson Fleet Servs., Inc.*, 527 S.W.2d 277, 280 (Tex. Civ. App. 1975) (same), *Simmons v. Hitt*, 546 S.W.2d 587, 591 (Tenn. Ct. App. 1976) (same), *and Schlumberger*, 859 F.2d at 517 (same), *with Keller v. Graphic Sys. of Akron, Inc., Emp. Profitsharing Plan*, 422 F. Supp. 1005, 1012 (N.D. Ohio 1976) (embracing the pragmatic approach), *San Souci v. United Wire & Supply Corp.*, No. C.A. 75-147, 1977 WL 186273, *2 (R.I. Super. Nov. 15, 1977) (same), *Ellis v. Lionikis*, 394 A.2d 116, 118–19 (N.J. Super., App. Div. 1978) (same), *and Torrence v. Hewitt Assocs.*, 493 N.E.2d 74, 78 (Ill. App. 1986) (same).  More specifically, under this expanded analysis, fifteen jurisdictions have embraced employee choice—nine by apex court decisions and six by non-apex court decisions—whereas fourteen jurisdictions have embraced the pragmatic approach—ten by apex court decisions and four by non-apex court decisions.

expressly aligned itself with either perspective.  However, we nonetheless predict that the Kansas Supreme Court—when seeking guidance from other apex courts regarding whether to apply reasonableness review to non-competition conditions precedent, like the Lawson Covenant—would gravitate toward, and align itself with, the approach of the apex courts that have adopted the employee choice doctrine. That is because those employee choice courts share the same or similarly strong respect as the Kansas Supreme Court for the background principle of freedom of contract.  *See* Part III.B.1.b, *supra*.  And were it to align itself with the approach of the employee choice courts, the Kansas Supreme Court would necessarily deem it appropriate to reject the application of reasonableness review to non-competition conditions precedent, such as the Lawson Covenant.

More specifically, courts have long recognized that the background principle of freedom of contract—which is held in very high regard in Kansas—is an "important" factor in the calculus of those courts that have embraced the employee choice doctrine.  *Almers*, 217 S.E.2d at 138.  Indeed, the Delaware Supreme Court adopted the employee choice doctrine in part because Delaware, like Kansas, holds "freedom of contract in high—some might say, reverential—regard."  *See Cantor Fitzgerald*, 312 A.3d at 676. [9]

---

[9]    In a Rule 28(j) notice of supplemental authority, Mr. Lawson commendably highlighted that the Delaware Supreme Court reversed the Court of Chancery decision—upon which he relied before the district court and on appeal.  *See* Rule 28(j) Letter, filed by Larry A. Lawson, No. 23-3136, at *1 (10th Cir., filed Feb. 1, 2024).  He nevertheless argued that the Delaware Supreme Court's decision in *Cantor Fitzgerald* "did not hold that forfeiture-for-competition agreements [such as

Though it has not expressly adopted the employee choice doctrine, the Kansas Supreme Court—inspired by a very high regard for freedom of contract, *see* Part III.B.1.b, *supra*, that is similar to that of those courts that have adopted the employee choice doctrine—seemingly would arrive at a similar conclusion as those courts regarding the applicability of reasonableness review to non-competition conditions precedent to future benefits, like the Lawson Covenant; that is, the Kansas Supreme Court would conclude that such review is *not* applicable.

Indeed, in *Miller*, the Kansas Supreme Court showed that it recognizes a similar distinction as the employee choice courts between true non-competition covenants and mere non-competition conditions precedent.[10] *Compare Miller*,

---

the one in *Cantor Fitzgerald*] should uniformly be upheld," but was instead "limited to forfeiture-for-competition provisions in limited partnership agreements *governed by the Delaware Revised Uniform Limited Partnership Act*." Rule 28(j) Letter, filed by Larry A. Lawson, No. 23-3136, at *1 (10th Cir., filed Feb. 7, 2024). However, as Spirit noted in its own Rule 28(j) letter, the Delaware Supreme Court recently rejected such a narrow reading, clarifying that "*Cantor Fitzgerald* is not restricted to the partnership context." Rule 28(j) Letter, filed by Spirit AeroSystems, Inc., No. 23-3136, at *1 (10th Cir., filed Jan. 2, 2025) (discussing *LKQ Corp.*, 2024 WL 5152746, at *4–6). Though Mr. Lawson would not be denied the last word in the battle of supplemental authority, *see* Rule 28(j) Letter, filed by Larry A. Lawson, No. 23-3136, at *1 (10th Cir., filed Jan. 7, 2025), we believe that Spirit comes out on top. Thus, we reject Mr. Lawson's narrow reading of *Cantor Fitzgerald*, in accordance with the Delaware Supreme Court's clarification in *LKQ Corp*.

[10] In *Cantor Fitzgerald*, the Delaware Supreme Court cited *Miller* for the proposition that Kansas has already adopted the employee choice doctrine. *See Cantor Fitzgerald*, 312 A.3d at 690 n.104. As noted in Part III.B.1.a, *supra*, because the Kansas Supreme Court assessed the *Miller* covenant under the Rules of Professional Conduct for attorneys rather than Kansas's mainstream noncompete jurisprudence, we respectfully disagree with *Cantor Fitzgerald*'s categorization: we do not believe that *Miller* definitively placed Kansas in the camp of the employee choice courts—that is, courts that would reject application of reasonableness review

790 P.2d at 413, *with Cinelli v. Am. Home Prods. Corp.*, 785 F.2d 264, 266 (10th Cir. 1986) (applying federal law) (recognizing "the distinction between contract provisions which restrain competition and provisions which merely work a forfeiture of an economic advantage"), *Rochester Corp.*, 450 F.2d at 122–23, *Tatom v. Ameritech Corp.*, 305 F.3d 737, 744 (7th Cir. 2002), *and Golden v. Kentile Floors, Inc.*, 512 F.2d 838, 844 (5th Cir. 1975).

Accordingly, irrespective of whether the Kansas Supreme Court would adopt the employee choice doctrine wholesale, we predict that it would gravitate toward, and align itself with, the approach of the apex courts that have adopted that doctrine and, thus, would *not* apply reasonableness review to covenants like the Lawson Covenant.

As to the weight of authority factor then, the substantive bottom line is that the factor supports our prediction that the Kansas Supreme Court would eschew application of reasonableness review to the Lawson Covenant—even though, viewed in terms of absolute numbers, the pragmatic approach commands a narrow one-jurisdiction majority over the employee choice doctrine.

As to the trend of authority, we conclude that this data point also supports our prediction. The trend of authority plainly favors the employee choice doctrine over the pragmatic approach. In that regard, no state apex court has adopted the pragmatic

---

to non-competition conditions precedent, like the Lawson Covenant. However, *Cantor Fitzgerald*'s citation supports our view that the Kansas Supreme Court's jurisprudence—with its very high regard for freedom of contract—is naturally congruent with the employee choice doctrine.

approach as a matter of first impression in nearly twenty years,[11] while multiple such

courts have endorsed employee choice in the last decade.  *See Trumble*, 456 P.3d

at 212; *Cantor Fitzgerald*, 312 A.3d at 691.  True, the 1981 Restatement (Second) of

Contracts opined that the employee choice doctrine was in decline.  § 185 (Am. L.

Inst. 1981), Westlaw (database updated Oct. 2024).  But the pragmatic wave

portended by the Restatement crested in the early 21st Century.[12]  Accordingly, we

conclude that the trend of authority supports our prediction that the Kansas Supreme

Court would align itself with the employee choice doctrine and thus eschew

application of reasonableness review to the Lawson Covenant.

---

[11]    The last apex court to adopt the pragmatic approach absent legislative guidance was the Connecticut Supreme Court, which decided *Deming* in 2005.  *See* 905 A.2d at 632–33.  The Montana Supreme Court adopted the pragmatic approach more recently, in 2009, but only in light of public policy established by positive legislation.  *See Mungas*, 221 P.3d at 1238 (citing Mont. Code Ann. § 28-2-703).

[12]    Employee choice came out of the gate hot, with five states adopting the doctrine between 1958 and 1971.  *See Kristt*, 155 N.E.2d 116; *Tatem*, 173 S.E.2d 818; *Alldredge*, 468 S.W.2d 1; *Swift*, 275 A.2d 359; *Garner*, 275 A.2d 359.  But the pragmatic approach stormed back, drawing ten states in comparison with two for employee choice between 1972 and 2006.  *Compare Van Hosen*, 200 N.W.2d 504 (adopting the pragmatic approach), *Food Fair Stores, Inc.*, 285 A.2d 632 (same), *Lavey*, 505 P.2d 342 (same), *Almers*, 217 S.E.2d 135 (same), *Harris*, 247 N.W.2d 600 (same), *Cheney*, 385 N.E.2d 961 (same), *Brockley*, 488 N.W.2d 556 (same), *A.L. Williams & Assocs.*, 386 S.E.2d 151 (same), *Fearnow*, 138 P.3d 723 (same), *and Deming*, 905 A.2d 623 (same), *with Woodward*, 240 N.W.2d 710 (adopting employee choice); *and Courington*, 347 So. 2d 377 (same).  After the Connecticut Supreme Court's 2006 decision in *Deming*, however, every state apex court to consider the issue, absent legislative direction, has adopted the employee choice doctrine.  *See Trumble*, 456 P.3d 201; *Cantor Fitzgerald*, 312 A.3d 674.  So, it seems fair to say that the resurgence of the pragmatic approach is over and employee choice has momentum.

Thus, we conclude that the weight and trend of authority also support our prediction that the Kansas Supreme Court would *not* apply *Weber* reasonableness review to the Lawson Covenant.

* * *

The upshot of our predictive analysis is that all the relevant guideposts—that is, Kansas case law, foundational principles of Kansas contract law, and the weight and trend of authority—all point in the same direction. Specifically, they support a prediction that the Kansas Supreme Court would not apply *Weber* reasonableness review to the Lawson Covenant. Before concluding our discussion of this matter, we turn to Mr. Lawson's arguments that seek to forestall this outcome. We find those arguments unavailing.

**d**

Mr. Lawson makes three principal arguments for reasonableness review. Mr. Lawson's first two arguments seek to explain why the employee choice framework should not govern here. The third argument contends that under the approach articulated by the Fourth Circuit in *Allegis Grp., Inc. v. Jordan*, 951 F.3d 203, 211 (4th Cir. 2020)—which is essentially a "hybrid" between the employee choice doctrine and the pragmatic approach—the Kansas Supreme Court would apply reasonableness review to the Lawson Covenant. These arguments lack merit. More to the point, they do not alter our prediction regarding how the Kansas Supreme Court would resolve the legal issue before us.

40

*First*, Mr. Lawson argues that even if the Kansas Supreme Court were to adopt the employee choice framework—which would not apply reasonableness review to a non-competition condition precedent to the receipt of future benefits—the court would not apply that doctrine here because the Lawson Covenant did not offer Mr. Lawson the *choice* to compete. We are not persuaded. If we restricted our analysis to the text of the Employment Agreement, this argument might have some legs: the Agreement plainly stipulates that Mr. Lawson shall not compete with Spirit for two years following the termination of his employment, and further entitles Spirit to enforce the noncompete with an injunction. *See* Aplt.'s App. ¶¶ 4(c), 4(f), at 103–104; *see also Lawson II*, 61 F.4th at 767.

But our analysis must necessarily reach beyond the Employment Agreement, because of the following: (1) the Retirement Agreement explicitly converted the Employment Agreement's non-competition covenant into a condition precedent by noting that Mr. Lawson's "continuing entitlement to payments and/or vesting . . . shall be conditioned upon" certain actions—most notably, abiding by the Covenant, Aplt.'s App. ¶ 2(g), at 79; and (2) the district court severed the Covenant's injunctive enforcement mechanism, *id.* at 461. Consequently, Paragraph 2(g) of the Retirement Agreement is the clause at issue, *not* the Employment Agreement. And Paragraph 2(g) of the Retirement Agreement is a condition precedent providing Mr. Lawson with a choice: comply and vest, or breach and forgo vesting. *See also* note 1, *supra*.

Mr. Lawson effectively admits—through his reliance on the Employment Agreement—that his lack-of-choice argument depends in part on our acceptance of

his contentions, first, that the district court's severance of the injunctive enforcement mechanism was improper and, second, that this mechanism was without material significance for the enforceability of the Lawson Covenant. We reject these contentions, for the reasons discussed *infra*. We thus conclude that, under the operative Covenant language—i.e., Paragraph 2(g) of the Retirement Agreement— Mr. Lawson had a choice as to whether he would compete with Spirit.

*Second*, Mr. Lawson avers that the employee choice doctrine is inapplicable because he did not *actually* "compete" with Spirit. Aplt.'s Opening Br. at 42. Mr. Lawson offers no legal support for his contention that the employee choice framework requires evidence of actual competition. Moreover, the notion that he did not actually compete with Spirit is at odds with our legal conclusion in *Lawson II* that Mr. Lawson breached the Covenant by virtue of, *inter alia*, his interest in Elliott and Elliott's investment in Arconic. *See Lawson II*, 61 F.4th at 759–66. That conclusion is law of the case. Accordingly, we think Mr. Lawson's second argument is without merit.

*Third*, Mr. Lawson invokes what we refer to here as the "hybrid" approach delineated by the Fourth Circuit in *Allegis*. There, applying Maryland law—which notably endorsed the pragmatic approach in *Food Fair Stores, Inc.*, 285 A.2d at 638—the Fourth Circuit declined to extend reasonableness review (which would otherwise be endorsed by the pragmatic approach) to a non-competition condition precedent to stock award vesting, reasoning that (1) the promisor had the *choice* to either receive payments or compete with the promisee; (2) the incentive plan

42

payments, like the LTIP shares at issue here, accrued no value during the period of the participants' employment—and, therefore, more closely resembled future benefits than already earned compensation; and (3) the promisors were well compensated professionals. *See Allegis*, 951 F.3d at 211.  This "hybrid" approach effectively distinguishes between forfeiture-for-competition covenants and non-competition conditions precedent to future benefits: the former, which condition the receipt of *already-earned compensation* on compliance, are subject to reasonableness review; whereas the latter, which condition receipt of *future benefits* on compliance, are not. Importantly, under the circumstances of this case—involving a non-competition condition precedent to future benefits—the "hybrid" approach would function like the employee choice doctrine in that it would the spare the Lawson Covenant from reasonableness review.[13]  This truth escapes Mr. Lawson, and fatally undermines his reliance on the "hybrid" approach.

---

[13]      We declined to consider the "hybrid" approach in our quantitative weight and trend of authority analysis, *see* Part III.B.1.c, *supra*, because neither Maryland's highest court—whose direction *Allegis* sought to predict—nor any other apex state court has expressly adopted that approach.  Nevertheless, we note that the advent of the "hybrid" approach in *Allegis* also offers some persuasive support for our prediction that the Kansas Supreme Court would decline to scrutinize the Lawson Covenant for reasonableness.  First, if the "hybrid" approach were included in the weight of authority analysis that would mean that two of the three perspectives regarding the application of reasonableness review to non-competition conditions precedent—the employee choice doctrine and the "hybrid" approach—would decline to review the Lawson Covenant for reasonableness.  Second, regarding the trend of authority, *Allegis* reflects the Fourth Circuit's somewhat recent assessment that a pragmatic jurisdiction—that is, Maryland—would modify its jurisprudence to embrace the "hybrid" approach when considering a non-competition condition precedent to the receipt of future benefits, such as the Lawson Covenant, and in doing so, would eschew the application of reasonableness review.  Both observations

Mr. Lawson contends that reasonableness review is appropriate here under the "hybrid" approach because this case concerns forfeiture of *already-earned* compensation. But the factual premise of his argument—*viz.*, Mr. Lawson's unvested award of shares constituted already-earned compensation—flies in the face of, and is contrary to, the district court's well-supported factual findings. *See* Aplt.'s App., Vol. II, ¶ 6, at 347. The shares had no value until vested. *Id.* What Mr. Lawson earned as CEO was not the value of the shares, but the *opportunity* to acquire the value of the shares at a later date, i.e., upon vesting, assuming he remained a Spirit employee.

The Retirement Agreement specifically provided an extension of Mr. Lawson's opportunity to acquire the value of his outstanding incentive shares, but *conditioned* that opportunity upon Mr. Lawson's extended compliance with the non-competition covenant. By choosing to compete, Mr. Lawson did not forfeit the *value* of already-earned compensation—the unvested awarded shares remained valueless at the time of his breach—but instead forfeited the *opportunity* for the shares to vest notwithstanding his retirement. Thus, even assuming that the Kansas Supreme Court adopted the hybrid approach, like the employee choice doctrine, that approach would *not* extend reasonableness review to the non-competition condition precedent to *future* benefits before us.

---

support our prediction in Part III.B.1.c, *supra*, that the Kansas Supreme Court— taking stock of decisional law in jurisdictions across the country—would decline to review the Lawson Covenant for reasonableness.

\* \* \*

In sum, Mr. Lawson's arguments are not persuasive.  They do not alter the clear and unambiguous message of our diversity-predictive analysis: the Kansas Supreme Court would not apply *Weber* reasonableness review to the non-competition condition precedent to *future* benefits, which is the nature of the Lawson Covenant.

### C

Mr. Lawson suggests that we should have forgone such a prediction and certified a legal question to the Kansas Supreme Court, specifically, the following question: whether Kansas law requires courts to apply a reasonableness test "in determining whether to enforce a non-compete clause when a former employee's compliance with the clause serves as a condition precedent to the receipt of the employee's *previously earned compensation* and the failure of the condition triggers the forfeiture of such compensation?"  Aplt.'s Mot. to Certify at *1 (emphasis added).  Spirit opposes certification.  We deny Mr. Lawson's motion to certify for four salient and independent reasons: (1) Mr. Lawson incorrectly frames the question; (2) as evident from the foregoing analysis, we are able to confidently resolve the question without certification; (3) Mr. Lawson waited too long to request certification; and (4) Mr. Lawson himself invoked federal jurisdiction.

First, Mr. Lawson improperly frames the question for certification as being whether reasonableness review applies "when a former employee's compliance with the clause serves as a condition precedent to the receipt of the employee's *previously earned compensation*."  Aplt.'s Mot. to Certify at *1 (emphasis added).

45

Mr. Lawson's question assumes the unvested shares that accumulated during his tenure as CEO are "previously earned compensation." We have already rejected this assumption as contrary to the district court's factual findings: the unvested shares had no cash value and would have terminated upon Mr. Lawsons retirement but for the Retirement Agreement. Because we reject the applicability of a key premise of Mr. Lawson's question, the Kansas Supreme Court's response to Mr. Lawson's proposed question would not resolve the issue before us. And certification is only appropriate where the question is "dispositive." *Kan. Jud. Rev. v. Stout*, 519 F.3d 1107, 1119 (10th Cir. 2008) (quoting *Anaconda Minerals Co. v. Stoller Chem. Co.*, 990 F.2d 1175, 1177 (10th Cir. 1993)). *Compare* 10th Cir. R. 27.4(A)(1) (noting that we may only "certify a question arising under state law to that state's highest *court according to that court's rules*" (emphasis added)), *with* Kan. Stat. Ann. § 60-3201 ("The Kansas supreme court may answer questions of law certified to it by . . . a court of appeals of the United States . . . if there are involved in any proceeding before it questions of law of this state *which may be determinative of the cause* then pending in the certifying court.").[14]

---

[14] Mr. Lawson contends that the Seventh Circuit's certification of a related question to the Delaware Supreme Court in *LKQ Corp.*, 96 F.4th at 977, cuts in favor of his motion to certify. That is so, Mr. Lawson suggests, because this case, like *LKQ Corp.*, presents a "'complicated and important issue' of state law." Resp. to Spirit AeroSystems, Inc.'s Rule 28(j) Letter, filed by Larry A. Lawson, No. 23-3136, at *1 (10th Cir., Jan. 7, 2025) (quoting *LKQ Corp.*, 96 F.4th at 987). But Mr. Lawson fails to engage with the rules of our court and the Kansas Supreme Court concerning certification: neither countenances certification merely because a question of state law is "complicated and important." *Id.*; *see Anaconda Minerals*, 990 F.2d at 1177; Kan. Stat. Ann. § 60-3201.

Second, certification is unnecessary to decide the question before us. True, the Kansas Supreme Court has not definitively opined on whether non-competition conditions precedent to future benefits are subject to *Weber* review—nor has any other Kansas court. But "we will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks." *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007); *accord Monarch Casino & Resort, Inc. v. Affiliated FM Ins. Co.*, 85 F.4th 1034, 1038 (10th Cir. 2023). Where, as here, "we see a reasonably clear and principled course, we will seek to follow it ourselves." *Pino*, 507 F.3d at 1236; *see also Sagome v. Cinn. Ins. Co.*, 56 F.4th 931, 938 (10th Cir. 2023) (deeming certification unnecessary because the issue could be resolved under "relevant precedent from Colorado and other jurisdictions").

Third, Mr. Lawson's motion to certify is untimely. The question of *Weber*'s applicability arose in 2021. But Mr. Lawson did not request certification until the district court deemed reasonableness review unnecessary in 2023. We disfavor such late blooming requests for certification. *See, e.g.*, *Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 178 F.3d 1363, 1364–65 (10th Cir. 1999).

Fourth, and lastly, Mr. Lawson himself invoked federal jurisdiction by suing Spirit in the District of Kansas. He thus finds himself "in a somewhat awkward position to now claim that the federal judge misunderstood" Kansas law. *See Colonial Park Country Club v. Joan of Arc*, 746 F.2d 1425, 1429 (10th Cir. 1984); *see generally* 17A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 4248 (3d ed.), Westlaw (database updated Apr. 2023).

47

For the foregoing reasons, we deny Mr. Lawson's motion to certify.

**D**

Finally, we address Mr. Lawson's contention that the district court improperly severed the Covenant's injunctive enforcement mechanism. Mr. Lawson raises three meritless challenges to the district court's severability finding.

First, Mr. Lawson argues that the district court's severance of the Covenant's injunctive enforcement mechanism is "irrelevant" because Kansas law subjects "non-compete clauses that impose solely economic penalties" to *Weber* reasonableness review. Aplt.'s Opening Br. at 56. Mr. Lawson assumes by this assertion that the surviving portion of the Covenant is a penalty-for-competition clause. But we rejected that assumption *supra*, concluding that the surviving language is not a penalty-for-competition clause, but instead a non-competition condition precedent to future benefits. Accordingly, Mr. Lawson's first argument is misguided and without merit.

Next, Mr. Lawson argues that "the district court failed to actually sever any terms or provisions of the Non-Compete Clause" because the district court only addressed enforcement mechanisms and left undisturbed the *scope* of the non-competition condition precedent. *Id.* at 57. Animated by the Kansas Supreme Court's *Idbeis* decision, this argument falters at the threshold. While Kansas's reasonableness analysis does indeed focus on "the scope of the restriction, not the presence of a remedy," the question here is not whether the Covenant is reasonable and thus enforceable, but whether it is subject to reasonableness review *at all*. *See*

48

*Idbeis*, 112 P.3d at 92. Mr. Lawson's contention that the district court failed to sever the objectionable portion of the Covenant is predicated on his assumption that *Weber* applies to non-competition conditions precedent, like the Covenant. We have predicted, however, that the Kansas Supreme Court would *not* extend *Weber* to such non-competition conditions precedent; accordingly, we reject this severability challenge.

Third, and lastly, Mr. Lawson contends, citing *Miller*, that the district court's severance was unjustified because a district court *must* find a provision unlawful before severing it. But Mr. Lawson mischaracterizes *Miller*. Specifically, Mr. Lawson cites *Miller* for his contention that "[t]here is *no basis* for a court to sever any provisions from a contract *unless* the court has found at least one of the provisions to be unlawful." Aplt.'s Opening Br. at 56–57 (emphasis added). But the relevant language from *Miller* reads: "A contract that contains valid and invalid provisions in which the lawful provisions can be easily severed will be upheld as to the lawful portion." 790 P.2d at 413. That portion of *Miller* stands for the proposition that if provisions *are* illegal, then they *are* severable from the lawful provisions. *Miller* thus articulates a conditional statement. Mr. Lawson reads it for its inverse—*viz.*, if provisions *are not* illegal, then they *are not* severable. But that proposition does not follow from *Miller's* holding. And besides, Mr. Lawson's first argument that severance is "irrelevant" and "has no impact on the outcome of this case," Aplt.'s Opening Br. at 56, fatally undermines his argument that the district court's allegedly improper severance entitles him to reversal.

49

For the foregoing reasons, we reject Mr. Lawson's challenge to the district court's severability analysis.

## IV

We **affirm** the district court's judgment and **deny** Mr. Lawson's motion to certify.